[L. A. No. 9762.  In Bank.—September 30, 1927.]

LONDON GUARANTEE AND ACCIDENT COMPANY, LIMITED (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION OF THE STATE OF CALIFORNIA and LOUISA MOSTEIRO, Respondents.

[1] Workmen's Compensation Act—Personal Injuries — Connection Between Injury and Employment. — In order for an employee to recover for personal injuries there must be some connection between the injury and the employment other than the mere fact that the employment brought the injured party to the place of injury; there must be a causal connection between the employment and the injury which had its origin in a risk connected with the employment, and flowed from that source as a rational and natural consequence.

1.  See 27 Cal. Jur. 341; 28 R. C. L. 797.

[2] ID.—INJURIES FROM ACTS OF NATURE.—As a general principle, an employer is not responsible for damages caused to his workman by lightning, storms, sunstroke, freezing, earthquakes, floods, etc., as these are considered as *"force majeure,"* which human vigilance and industry can neither foresee nor prevent.

[3] ID.—DEFECTIVE BUILDING — CONFLICTING EVIDENCE — PRESUMPTION. In a proceeding before the Industrial Accident Commission to recover for injuries sustained by an employee by the falling of a building in which he was working by reason of an earthquake, where there was substantial conflict in the evidence before the Commission regarding the manner of the construction of the building, the court in passing upon the power of the Commission to make an award in favor of the applicant must assume that the award was made in view of and in reliance upon the evidence which tended to show that the building was constructed of either inferior materials or by improper workmanship.

[4] ID.—RISK IN DEFECTIVE BUILDING—RIGHT OF RECOVERY.—Where an employee is compelled to perform his work in a building defective in construction, he is exposed to a risk of being injured by an earthquake which is greater than that to which the public generally in that vicinity is subject, and injuries received by him in the collapse of the building caused by the earthquake arise out of his employment and recovery therefor may be had.

(1) Workmen's Compensation Acts, **C. J.**, p. 74, n. 87, p. 77, n. 96. (2) 29 **Cyc.**, p. 441, n. 86. (3) Workmen's Compensation Acts, **C. J.**, p. 123, n. 41. (4) 1 **C. J.**, p. 1173, n. 24, p. 1174, n. 34, p. 1175, n. 35. Workmen's Compensation Acts, **C. J.**, p. 77, n. 97.

PROCEEDING in Certiorari to review an award of the Industrial Accident Commission for injuries resulting in death. Award affirmed.

The facts are stated in the opinion of the court.

Heaney, Price & Postel for Petitioner.

G. C. Faulkner for Respondent Industrial Accident Commission.

2. See 27 Cal. Jur. 371; 28 R. C. L. 806.

3. Right and extent of review of findings of commission, notes, L. R. A. 1917D, 186. See, also, 28 R. C. L. 828. Review of facts under Workmen's Compensation Act, notes, Ann. Cas. 1916B, 475; Ann. Cas. 1918B, 647. See, also, 27 Cal. Jur. 578.

W. P. Butcher for Respondent Louisa Mosteiro.

Faries & Williamson, *Amici Curiae*, for Respondents. `

CURTIS, J.—Proceeding brought to review and annul an award made by the Industrial Accident Commission in favor of Louisa Mosteiro for the death of her husband, Segismundo Mosteiro, who was killed by the falling walls of the San Marcos building in the city of Santa Barbara. Segismundo Mosteiro was employed as a janitor in said building. The walls of the building collapsed during an earthquake which occurred in said city on the morning of June 29, 1925, at the hour of 6:45. The evidence is without conflict that Mosteiro was struck and killed by the falling walls of said building while performing services arising out of his employment. The finding of the Commission was that "Segismundo Mosteiro, deceased, while employed as a janitor on June 29, 1925, at Santa Barbara, California, by defendants . . . sustained injury occurring in the course of and arising out of his employment as follows: Was struck by portions of the building in which he was working, proximately causing his death the same day."

If the injury sustained by Mosteiro was the direct result of the earthquake, the award cannot be sustained. Such an injury did not arise out of the employment nor in the terms of section 6 (a) of the Workmen's Compensation Act (Stats. 1917, p. 834) "is it proximately caused by the employment." [1] "There must be some connection between the injury and the employment other than the mere fact that the employment brought the injured party to the place of injury. There must be a causal connection between the employment and the injury which had its origin in a risk connected with the employment, and flowed from that source as a rational and natural consequence." (*Larson* v. *Industrial Acc. Com.*, 193 Cal. 406, 409 [224 Pac. 744, 745]; *California Casualty Indemnity Exch.* v. *Industrial Acc. Com.*, 190 Cal. 433 [213 Pac. 257].) As was said by this court in the recent case of *Storm* v. *Industrial Acc. Com.*, 191 Cal. 4, 7 [214 Pac. 874], "To render an injury compensable there must be discernible some relationship of cause and effect between the employment and the injury, 'It is not sufficient for a workman to say, "I should not have been

` 202 Cal.—16

injured unless I had been where I was and doing the work which I was employed to do.' ' (*Cooper* v. *Northeastern Ry. Co.*, 9 B. W. C. C. 129.) It must be shown, in addition, that the injury was a natural or probable result of the employment, or of the conditions thereof. Such would seem to be the meaning of the requirement that it must have been 'proximately caused by the employment.' ''

[2] The responsibility of an employer for an injury sustained by his employee resulting from an earthquake or other like peril has frequently been the subject of judicial determination, and the rule applied by the courts almost universally is as follows: ''As a general principle, the employer is not responsible for damages caused to his workmen by lightning, storms, sunstroke, freezing, earthquake, floods, etc. These are considered as *'force majeure,'* which human vigilance and industry can neither foresee nor prevent. The victim must bear alone such burden, inasmuch as human industry has nothing to do with it and inasmuch as the employee is no more subject thereto than any other person. Every human being is liable to suffer from events in which he has no share of responsibility.'' (28 R. C. L. 806; *State* v. *District Court*, 138 Minn. 260 [L. R. A. 1918F, 921, 164 N. W. 917]; *Griffith* v. *Cole*, 183 Iowa, 415 [L. R. A. 1918F, 923, 165 N. W. 577]; *Klawinski* v. *Lake Shore etc. R. Co.*, 185 Mich. 643 [L. R. A. 1916A, 342, 152 N. W. 213].)

However, in support of said award the respondent relies upon the finding of the Commission that the injury sustained by deceased arose out of his employment and that the proximate cause of his death was that he was struck by portions of the building in which he was working. Respondent contends that there was evidence before the Commission which justified this finding. The evidence so relied upon was that which was offered for the purpose of establishing that the fatal injury suffered by decedent proximately resulted not wholly from the earthquake, but in part, at least, from the defective construction of the building which would not have fallen from the effect of the shock of the earthquake had it not been constructed of inferior materials. Upon the question of the proper or improper construction of the building, a large amount of evidence was introduced before the Commission. It was shown that the earthquake of June 29, 1925, was the most serious disturbance of its kind that had

occurred in said city during its history of over one hundred years; that many apparently substantial buildings in the near vicinity of the San Marcos building had been destroyed or severely injured as the result of said disturbance and that some thirteen persons lost their lives as a result thereof; that the San Marcos building was constructed according to plans and specifications prepared by a qualified architect and by structural engineers; that all materials such as rock, sand, cement, and steel which went into the construction of said building were thoroughly tested before being used; that the mechanical construction of the building was in accordance with the accepted standards and methods in use at the time it was built, and that after the earthquake a chemist had subjected specimens of the cement taken from the building to a scientific test and found that the specimens so tested showed a sustaining strength of more than fourteen hundred pounds, whereas the general average of all standards of cement is one thousand pounds. On the other hand, there was evidence that buildings in the near vicinity of the San Marcos building and similar in character were only slightly damaged by said earthquake; that the San Marcos building was a reinforced concrete building, and that specimens of concrete from the building showed that it was improperly mixed, resulting in an improper bond between the cement and the gravel or other material in which it was mixed. One witness testified that a drill would go through the cement "like a piece of cheese." O. H. O'Neill, a witness before the Commission, whose occupation was that of engineer and surveyor and who testified that he had ten to twelve years' experience in the use of cement in constructing bridges and highways, also testified as follows:

"A. What I saw—it was a very superficial examination— I noted that the fractures through the beams or columns were not fractures through the coarse aggregate or rock used in the material, and instead of breaking on through as a homogenous would they separated around the particles of crushed rock or gravel used in the construction. Q. What would that indicate? A. That would indicate a lack of perfect bond between the cement or mortar, which is composed of sand and cement and the rock aggregate used in the material. Q. Would that result either from not a proper mixing or too hasty mixing? A. It could result

from the use of too much water or dirty sand or lack of proper mixing. Q. What do you mean by lack of proper mixing? A. The theory of concrete is that each particle of sand must be coated with cement and each stone coated with cement and then the mortar bonding all that together; and if you do not mix it long enough each particle of sand does not get coated with cement, neither does each portion of aggregate get bonded together with the mortar.''

T. W. Osgood, assistant superintendent of the department of safety, California Industrial Commission, testified before the Commission as follows: ''A. At the time I first saw the building it was in collapse; there were two or three points that I noted, one of them was the fact that the concrete in a great many instances was stripped from the reinforcing rods, and that the mass of concrete as a whole broke rather fine in the collapse. I picked up three pieces of concrete the size of a man's head, approximately, and pounded them either on the pavement or one against the other, in which three cases there appeared lack of cohesion between the coarser aggregate. Q. You mean cohesion between the reinforcing aggregate and the mortar? A. Between the stones making up the coarser aggregate. The reinforcing steel at the joints where I observed it was joined with pipe, ferrules, the reinforcing steel being butt-ended together inside a ferrule which was approximately 12 to 14 inches in length. That at one time was considered perhaps suitable construction; it is past, however; I don't know of any construction where that system is used.'' He further testified in answer to questions propounded to him: ''Q. Could you without a test of the cement form a conclusion as to its quality? A. The quality of the cement—well, I wouldn't hesitate to say that it is not first class. Q. In what particulars was it deficient? A. As before stated, there was a lack of cohesion or cementing between the various stones which made up the coarser aggregate. Q. And what would cause that lack of cohesion? A. That might be due to a variety of conditions; foreign matter in the mixture is inert material, shortage or excess of water, poor cement. That is all that I have in mind right now.'' We also find the following in Mr. Osgood's testimony: ''Now, in the San Marcos building (and I will make this a general statement affecting the other buildings that were damaged) the prime cause of failure was

due to a general disregard to the precautions which can reasonably be expected to resist the stresses sent up by an earthquake; and by those precautions I mean this: a tying together of the structural part of the building either by means of structural steel columns, beams and girders or by heavily reinforced concrete. Those, I believe, cover my ideas for the causes of failure under earthquake conditions.''

[3] It is apparent from the foregoing statement that there was a substantial conflict in the evidence before the Commission regarding the manner of the construction of the San Marcos building, and in passing upon the power of the Commission to make the award in favor of the applicant we must assume that said award was made by the Commission in view of and in reliance upon the evidence before it which tended to show that said building was constructed of either inferior materials or by improper workmanship. If, then, the decedent was compelled to carry on his employment in a defectively constructed building which may not have fallen from the effect of the earthquake shock except for the inferior character of its construction, then the injury received by him was, in part at least, due to the nature of his employment, and, we think, was such an injury which can reasonably be said to have arisen out of his employment. As was said by the supreme court of Illinois in the case of *Central Illinois Service Co.* v. *Industrial Com.,* 291 Ill. 256 [13 A. L. R. 967, 126 N. E. 256], ''We believe the reasonable rule to be that if deceased, by reason of his employment, was exposed to a risk of being injured by a storm which was greater than the risk to which the public in that vicinity was subject, or if his employment necessarily accentuated the natural hazard from the storm, which increased hazard contributed to the injury, it was an injury arising out of the employment although unexpected and unusual.'' In *State ex rel. Peoples Coal & I. Co.* v. *District Court,* 129 Minn. 502, 503 [L. R. A. 1916A, 344, 153 N. W. 119], the supreme court of Minnesota said: ''If the deceased was exposed to injury from lightning by reason of his employment, something more than the normal risk to which all are subject, if his employment necessarily accentuated the natural hazard from lightning, and the accident was natural to the employment, though unexpected or unusual, then a finding is sustained that the

accident from lightning was one 'arising out of employment.' ''

[4] There can be no question in this case that the deceased by being compelled to perform his work in a building defective in construction was exposed to a risk of being injured by an earthquake which was greater than that to which the public generally in that vicinity was subject. It follows, therefore, that the injury received by him was one arising out of his employment.

While the earthquake, an act of God, may have contributed to the injury, yet it was not the sole cause of such injury, and except for the intervention of some human agency might not have produced any injury whatever. In discussing the meaning of an act of God, the author of Corpus Juris, volume 1, pages 1173 and 1174, says: "The phrase has been otherwise defined as . . . an act of nature which implies entire exclusion of all human agency." In an early case before the supreme court of this state, Mr. Justice Sanderson expressed the rule in the following language:

"What acts are to be regarded in the legal sense as 'acts of God' is well settled. . . . The expression excludes the idea of human agency, and if it appears that a given loss has happened in any way through the intervention of man, it cannot be held to have been the act of God, but must be regarded as the act of man.

"Can a different rule be applied to the interpretation of the expression 'the act of the elements?' Is it more comprehensive than the former? Does it include acts which the former does not? The answer is not material to the present purpose; for be that as it may, for the purpose of determining the cause of a particular event, the same test must be resorted to in one case as in the other. If an act to which human agency has in any way contributed, cannot be considered as the act of God, but must be held to be the act of man, how does it become less the act of man if we substitute the elements in the place of God? The elements are the means by which God acts, and we are unable to perceive why 'damages by the elements' and 'damage by the acts of God,' are not convertible expressions in the law of leases." (*Polack* v. *Pioche*, 35 Cal. 416, 422, 423 [95 Am. Dec. 115].) Quoting again from the author of Corpus Juris, volume 1, page 1174, we find the following: "The principle embodied

in all of the definitions is that the act must be one occasioned exclusively by the violence of nature and all human agency is to be excluded from creating or entering into the cause of the mischief. When the effect, the cause of which is considered, is found to be in part the result of the participation of man, whether it be from active intervention or neglect, or failure to act, the whole occurrence is thereby humanized, as it were, and removed from the operation of the rules applicable to the acts of God.''

These words, in our opinion, aptly portray the condition shown to exist by the facts in the present proceeding. The destruction of the building in part having been contributed to by its defective construction, the whole occurrence was thereby humanized, and in fixing the liability of the parties hereto the part attributed to the earthquake must be eliminated as a contributing cause of the building's downfall. Under these conditions the award of the Commission should be and is hereby affirmed.

Richards, J., Shenk, J., Langdon, J., Seawell, J., and Waste, C. J., concurred.

Rehearing denied.