[Civ. No. 29845. Fourth Dist., Div. Two. Dec. 14, 1983.]

SKIP FORDYCE, INCORPORATED et al., Petitioners, v.
WORKERS' COMPENSATION APPEALS BOARD,
RUTHELLA BARRY et al., Respondents.

COUNSEL

Mark, Bolson & Kallemeyn and Hogen J. Kallemeyn for Petitioners.

Banks, Leviton, Kelley, Drass & Kelsey, Eugene Leviton, Jones, Nelson, Sisk & Ford and John A. Haley for Respondents.

OPINION

**KAUFMAN, J.**—The Workers' Compensation Judge (WCJ) awarded death benefits to the widow of Homer Joe Barry, and the Workers' Compensation Appeals Board denied reconsideration of the award, adopting the specifi-

cation of evidence and reasons of the WCJ in his report and recommendation. Skip Fordyce, Incorporated, the affected employer, and Fireman's Fund Insurance Company, the alleged carrier, seek a writ of review.

## Facts

Over his lifetime, Homer Joe Barry worked at various times as a policeman, motorcycle painter and repairman, welder, airplane repairman, and maintenance mechanic. From 1952 to 1957, Barry worked at Skip Fordyce, a motorcycle sales and service concern. Barry was employed as a motorcycle mechanic and painter. He returned for a period of time to work at Fordyce in 1961, when he primarily worked in the parts department selling parts over the counter. In the earlier period of employment at Fordyce, in the 1950's, Barry's son saw his father doing brake work at the Fordyce shop. The son testified he saw his father grind the corners on brake shoes to make them fit. He did this on an electric wheel grinder, creating dust in the grinding process. In 1974, a chest X-ray revealed a 1.5 centimeter lesion on Barry's left lung. In January 1975, reexamination showed the lesion had grown to 2 to 3 centimeters in diameter. He was diagnosed as having a large cell anaplastic carcinoma of the lung. The pathological tissue examination report stated Barry had an anaplastic large cell tumor probably of squamous cell origin. The pathologist listed the diagnosis as metastatic carcinoma. Barry underwent radiation therapy and chemotherapy but he died in November 1975. Barry smoked for over 20 years but quit in about 1965.

Other facts will be developed as necessary to the discussion of the issues presented.

## Discussion

The WCJ made a finding that Fireman's Fund was the workers' compensation insurance carrier for Skip Fordyce during the relevant period. The WCJ also found that Barry's death arose out of his employment at Skip Fordyce, based on his determination that Barry was exposed to asbestos at Skip Fordyce when working on brake linings in the shop.

Fireman's Fund, for itself, claims the WCJ erred in finding it to be the workers' compensation carrier, urging there is no substantial evidence to support the finding.

Further, both Fireman's Fund and Skip Fordyce contend the finding there was exposure to asbestos at the Skip Fordyce shop is not supported by substantial evidence, and that there is no substantial evidence the work on the brake linings was a contributing cause of Barry's death.

*Scope of Review*

Labor Code section 5952 provides: "The review by the court shall not be extended further than to determine, based upon the entire record . . . whether: . . . [¶] (d) The order, decision, or award was not supported by substantial evidence." Several recent cases have fleshed out the meaning of "substantial evidence" in the context of review of workers' compensation proceedings. In *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627 [83 Cal.Rptr. 208, 463 P.2d 432], the court stated: "In reviewing the evidence our legislative mandate and sole obligation . . . is to review the entire record to determine whether the board's conclusion was supported by substantial evidence." (*Id.*, at p. 637.)

*LeVesque* specifically rejected earlier judicial declarations that an award of the Board must be sustained if supported by " 'any evidence' " or " 'any substantial evidence.' " ■ Because our legislative mandate is " 'to determine, *based upon the entire record* . . . whether: . . . (d) The order, decision, or award was not supported by substantial evidence,' " the reviewing court must consider the weight or persuasiveness of all of the evidence, not just whether there is substantial evidence in favor of the respondent. (*Hulbert* v. *Workmen's Comp. Appeals Bd.* (1975) 47 Cal.App.3d 634, 638-639 [121 Cal.Rptr. 239].)

" '[Before these recent cases,] . . . [t]he meaning of the term "substantial" ha[d] not been specifically defined in a workers' compensation case, but the term, as used in the substantial evidence rule applied on appellate review generally, has been defined as follows: " 'Substantial evidence' is evidence which, if true, has probative force on the issues. It is more than a mere scintilla, and means such relevant evidence as a *reasonable mind might accept as adequate to support a conclusion.* . . . If the word 'substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously, the word cannot be deemed synonymous with 'any' evidence. It must be *reasonable in nature, credible, and of solid value*; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." *Teed Estate,* 112 Cal.App.2d 638, 247 P.2d 54 (1952); see also *Dyer* v. *Knue,* 186 Cal.App.2d 348, 8 Cal.Rptr. 753 (1960); *Hulbert* v. *W.C.A.B.* [47 Cal.App.3d 634] . . . .' (Italics added.) (1 Hanna, Cal. Law of Employee Injuries & Workmen's Compensation (2d rev. ed. 1981) § 10.08[2][a], p. 10-26, fn. 21.)" (*Insurance Co. of North America* v. *Workers' Comp. Appeals Bd.* (1981) 122 Cal.App.3d 905, 910 [176 Cal.Rptr. 365]; see *United Professional Planning, Inc.* v. *Superior Court* (1970) 9 Cal.App.3d 377, 393 [88 Cal.Rptr. 551].) "Factual findings of the WCAB are thus not supported by substantial evidence in light of the entire record where such findings are in conflict

with *all* of the evidence [citations], based upon inferences which cannot be fairly drawn from the evidence [citation], based upon evidence which lacks probative force [citation], based upon a purely 'fanciful conclusion' [citation], or based upon 'the creation of nonexistent evidence [or] the creation of a conflict in the evidence which does not otherwise exist' [citation]. [¶] Thus, the 'substantial evidence in light of the entire record' standard of judicial review is not some metaphysical concept. . . . In other words, where the WCAB's decision is not within the realm of what a reasonable trier of fact could find, the decision is not supported by substantial evidence and must be annulled. (*Universal City Studios, Inc.* v. *Workers' Comp. Appeals Bd., supra,* 99 Cal.App.3d 647 [160 Cal.Rptr. 597].)" (*Insurance Co. of North America* v. *Workers' Comp. Appeals Bd., supra,* 122 Cal.App.3d 905, 910-911.)

### Evidence of Coverage

Stephen A. Fordyce, the owner of Skip Fordyce, testified that from 1952 forward he assumed he had workers' compensation coverage because he had a reputable insurance agent to take care of his insurance needs. He testified that, during the critical period of time, his insurance agent was either Flaherty & Adams or Victor Tyler, but he did not remember which. He did not remember submitting any claims for individuals who were injured on the job during that period of time. He did not remember ever selecting or designating the carrier the agent was to place the insurance with; he simply relied upon the agent. He further testified he did not know the difference between workers' compensation insurance and group health insurance or between workers' compensation insurance and liability insurance.

Victor Tyler testified that during the period of time between 1952 and 1957 he was employed as an insurance solicitor by Flaherty & Adams. Skip Fordyce was a client of Flaherty & Adams at that period time. Tyler later left Flaherty & Adams and formed his own business, and Skip Fordyce became a client of Tyler and Company in the 1960s. Tyler testified he did not personally handle the Skip Fordyce account at Flaherty & Adams. However, he knew that Flaherty & Adams had placed insurance coverage other than workers' compensation insurance for Skip Fordyce with the Fireman's Fund. When he was asked with whom Flaherty & Adams placed Skip Fordyce's worker's compensation insurance, he answered: "I cannot tell you to a certainty with whom they placed the workers' compensation coverage. I can tell you that probably in excess of 90% of the business written in Flaherty & Adams' office was written in the Fireman's Fund. The Fireman's Fund—I beg your pardon, Flaherty & Adams at that time did do some workers' compensation coverage with workers' compensation specialty car-

riers. Beyond that something I can't tell you, I don't know." He further testified that, at Flaherty & Adams "It was generally accepted the business was going to Fireman's Fund. The only time that it did not was when there was an exception to the rule for one reason or another."

Finally, the records of the Workers' Compensation Insurance Rating Bureau showed that Fireman's Fund was the workers' compensation insurance carrier for Skip Fordyce from October 1, 1958, to October 1, 1960. While the Bureau did not have any records of years before 1958, because they had been destroyed by fire, the Bureau records show Fireman's Fund as the carrier in 1958, the very first indication of coverage immediately following the critical 1952-1957 period. By contrast, Fireman's Fund presented no evidence to show coverage did not exist. No employee testified about Fireman's Fund's records. The WCJ was simply informed by counsel that Fireman's Fund had no records at all for Skip Fordyce. Fireman's Fund admitted coverage for 1958 to 1960, but based the admission solely on the Rating Bureau's report of coverage. Nor did Fireman's Fund present any evidence that the coverage in 1958 was under a new policy.

The question is whether, based on this record, a reasonable trier of fact could find that Fireman's Fund provided workers' compensation coverage to Skip Fordyce during the relevant period. ■ Determinations of the WCAB are based on a preponderance of the evidence, which has been defined as "'such evidence as, when weighed with that opposed to it, has more convincing force, and from which it results that the greater probability of truth lies therein.'" (Witkin, Cal. Evidence (2d ed. 1966) § 208, p. 189; see BAJI No. 2.60 (6th rev. ed. 1977), pp. 45-46; cf. *Butcher* v. *Thornhill* (1936) 14 Cal.App.2d 149, 152 [58 P.2d 179].) Judging the probabilities with respect to the evidence is entirely within the province of the board. Our function as an appellate court is not to say which evidence has the greater probability of truth, but rather to determine whether a reasonable trier of fact could have found the evidence more convincing.

Fireman's Fund argues there is no evidence that it provided coverage during the years in question. Fireman's Fund argues Skip Fordyce changed workers' compensation insurance carriers so often between 1958 and 1970 that no reasonable inference can be drawn that Fireman's Fund provided any coverage before October 1, 1958.[1] Yet, the fact remains that Fireman's

---

[1]The records of the Workers' Compensation Insurance Rating Bureau show the following coverages beginning in 1958: Fireman's Fund Insurance Company (10/1/58 -10/1/60), INA Underwriters Insurance Company (10/1/60 - 4/12/61), Zenith Insurance Company (4/12/61 - 4/12/62), Argonaut Insurance Company (4/12/62 -4/12/63), Aetna Casualty & Surety Co. (4/12/63 - 4/12/64), Glens Falls Insurance Co. (4/12/64 - 2/1/66), Aetna Casualty & Surety Co. (2/1/66 - 2/1/67, 2/1/68 - 2/1/69), U.S. Fidelity & Guaranty Co. (6/20/69 -6/20/70).

Fund was the first carrier shown in the Bureau records immediately following the critical time period.

Fireman's Fund also argues that no value may be placed on Victor Tyler's testimony. Tyler testified that, when he handled the Skip Fordyce account during the early 1960's, his primary carrier was U.S. Fidelity & Guaranty Co., and he probably placed the Skip Fordyce workers' compensation coverage with that company. Because the records of the Workers' Compensation Insurance Rating Bureau showed Skip Fordyce's workers' compensation coverage during the 1960's to have been placed with a number of companies other than U.S. Fidelity & Guaranty Co., Fireman's Fund contends Tyler's testimony was speculative, conjectural and unreliable. Because Tyler's testimony was incorrect as to the carrier with whom coverage was placed by him in his own business, Fireman's Fund contends his testimony as to the carrier with whom coverage was most likely placed by the Flaherty & Adams agency must also be incorrect and should be disregarded. This argument, however, ignores the facts that Tyler also stated he could have placed Fordyce's coverage with Aetna, Zenith, Pacific Employers Insurance Company or INA, during the 1960's; that INA, Zenith and Aetna all provided workers' compensation coverage for Skip Fordyce during the early 1960's; and, that U.S. Fidelity & Guaranty Co. did in fact provide workers' compensation coverage for Skip Fordyce from 1969 to 1970. Tyler's testimony was thus not wholly incorrect or incredible. The discrepancies, if any, go to the weight to be given the testimony, a question for the trier of fact.

The Bureau's records do not show Fireman's Fund did not provide coverage before 1958—the Bureau simply had no records for periods prior to that time. Fireman's Fund was the carrier listed in 1958, the first year for which the Bureau had records. Flaherty & Adams was Skip Fordyce's insurance agent during the relevant time period, and Tyler testified that 90 percent of Flaherty & Adams workers' compensation coverage was placed with Fireman's Fund. Taken altogether the evidence gives rise to a reasonable inference that the coverage was in fact placed with Fireman's Fund during the critical period.

Although the evidence of coverage is not free from all doubt, there is utterly no evidence whatever showing Fireman's Fund did not provide the coverage from 1952 to 1957. ■ When the evidence of coverage is balanced against that of no coverage, the trier of fact could reasonably determine that the evidence in favor of coverage was the more convincing. That is all that is required. As the court stated in *Wirz* v. *Wirz* (1950) 96 Cal.App.2d 171, 175 [214 P.2d 839, 15 A.L.R.2d 1129]: "[A]bsolute certainty is not required 'because such proof is rarely possible.' . . . In *Liv-*

*erpool etc. Ins. Co.* v. *Southern P. Co.*, 125 Cal. 434, 440, 441 [58 P. 55], it is said: 'In civil cases which are decided in favor of the litigant upon a mere preponderance of evidence, the rule of decision is, after all, but a rule of probability. . . .' . . ." (*Ibid.,* disapproved on another point in *Dribin* v. *Superior Court* (1951) 37 Cal.2d 345, 350-351 [231 P.2d 809, 24 A.L.R.2d 864].) We conclude that there was substantial evidence to support the finding that Fireman's Fund provided workers' compensation coverage to Skip Fordyce during the period in question.

### Evidence of Asbestos Exposure

The only possible evidence of asbestos exposure we have been able to glean from an exhaustive examination of the entire record are: (1) a reference in the medical report of Dr. Merliss of August 13, 1975; (2) a reference to asbestos in the automotive industry in a pamphlet attached to the report; (3) a remark by Stephen Fordyce that he had been advised asbestos was contained in brake linings; and (4) the "admission" of Pacific Employers Insurance Company and United States Fidelity & Guaranty Company that "It is common knowledge that brake linings contain asbestos."

■ The so-called "admission" of Pacific Employers Insurance Company and United States Fidelity & Guaranty Company in their answer to the petition for reconsideration that "It is common knowledge that brake linings contain asbestos" is, first of all, not evidence, and secondly, can have no possible binding effect on Skip Fordyce or Fireman's Fund.

■ The remark by Stephen Fordyce on cross-examination, relied on by the WCJ, is equally lacking in probative force. In answer to the question, "Mr. [Fordyce], do you know whether or not brake linings contain asbestos?" Fordyce answered: "Just since this came up I have been alerted to it." This response cannot reasonably be construed as an admission the brake linings Barry worked on between 1952 and 1957 actually contained asbestos. The question was framed in the present tense and the answer must be interpreted accordingly. Obviously, as a result of the filing of the workers' compensation case, Fordyce became aware of the allegation that the brake linings in question contained asbestos and his answer either referred to that or that he had recently learned that asbestos is commonly used in brake linings. Fordyce's statement has no probative value on the question of the composition of the brake linings Barry worked on in his shop 20 years earlier.

Dr. Merliss appended to one of his reports a pamphlet of the National Institute for Occupational Safety and Health, a U.S. Government agency, entitled "Caution: Asbestos Dust is hazardous to *your* health." The pam-

phlet is a basic information booklet consisting of general informational statements presented with cartoon figures and drawings. On page 3 the major uses of asbestos are generally described. The pamphlet states under subheading 2 "Automotive Industry" that asbestos is "Widely used as friction material in brake and clutch linings . . . also as undercoating to protect against corrosion." The cartoon informational booklet is copyrighted 1973. (6) The pamphlet provides no evidence whatsoever about the composition of brake linings in the automotive industry in the 1950's, the composition of motorcycle brake linings in general, or the composition of the particular brake linings Barry worked with at Skip Fordyce. It is not evidence of anything.

We turn finally to Dr. Merliss' report itself. Dr. Merliss examined Barry in his office on June 23, 1975. He reported: "The question of carcinogenesis and prior employment is important, since the latent period for cancer is often long. I have gone into this patient's prior employment, and the information I have obtained is as follows:

| "Name of Employer | Period | Notes |
| --- | --- | --- |
| Boeing | 1939-1943 | Arc and gas welding. Can't remember any asbestos. |
| Naval guard at blimp base in Oregon | 1943-1944 | Does not remember asbestos. |
| Police department in Salem, Oregon | 1944-1945 | No asbestos |
| Police department in Portland | 1945-1948 | No asbestos |
| Lumber company in Eureka | 1948 | No asbestos |
| Police department in Eureka | 1948-1952 | No asbestos |
| Skip Fordash [sic] Motorcycles | 1952-1955 | *Repaired asbestos brakes and would inhale asbestos dust.* Would grind or cut ends of the brakes and thereby put asbestos dust into the air which he inhaled. (Italics added.) |
| Police department in Banning | 1955-1962 | No asbestos. |
| Self-employed. Sold motorcycles | 1962-1965 | The patient did no brake work during this period. An employee, *his son, did it instead.* (Italics added.) |
| Fordash [sic] Motorcycles | 1965-1967 | Parts. Uncertain of asbestos exposure. |
| Self-employed. | 1968-1969 | No asbestos. |
| Hemic motorcycles | 1970-1971 | No asbestos. |

Deutsch Electronics      Nov. 1972- *Asbestos exposure as noted be-*
                           Jan. 20,     *low.* (Italics added.)
                           1975

[¶] With his work at Deutsch Electronics the patient did work with asbestos paper. He handled asbestos gloves. He would work on a coarse bake oven in which the hot coils were insulated with asbestos. Most of the time however he welded, and would use heliarc and would work on stainless steel and galvanized pipe.''

From the language of the report, it is possible to infer that Barry told Dr. Merliss, upon inquiry, what he could remember about asbestos exposure throughout his working life. Obviously, Dr. Merliss has no personal knowledge of the presence or absence of asbestos materials at any of the listed jobsites. The most that can be said is that Dr. Merliss faithfully reported what his patient told him. This is at least double, and possibly triple, hearsay. Even assuming that the inference is correct that Barry told Dr. Merliss of his asbestos exposure while working at Fordyce, there is no evidence of, or any means of finding out, the basis of Barry's supposed statement. There is no indication that he had personal knowledge of the materials from which brake linings were manufactured in 1952-1957. The medical report, and inferences which may be drawn therefrom, establish no more than that someone may have told Barry that the brake linings contained asbestos. In fact, from the doctor's report it is not possible to tell with certainty whether Barry himself made any direct statement about asbestos. He may have simply talked about his work, including the repair work on the brake linings, and the reference to asbestos could have come entirely from Dr. Merliss himself.

██ Hearsay evidence is admissible in workers' compensation proceedings. (Lab. Code, § 5708; *Pacific Emp. Ins. Co.* v. *Ind. Acc. Com.* (1941) 47 Cal.App.2d 494, 499 [118 P.2d 334].) The admissibility of hearsay evidence, however, is limited to situations "when it is best calculated to ascertain the substantial rights of the parties [citation]. A material finding based entirely upon hearsay testimony of an incompetent witness is insufficient. It has no probative force and is not calculated to ascertain the substantial rights of the parties. . . . [¶] '. . . [A]ny award made must have for its basis a firm foundation of fact.' (*Berzin* v. *Industrial Acc. Com.,* 125 Cal.App. 522, 526 [14 Pac. (2d) 97]; *London Guar. & Acc. Co., Ltd.* v. *Industrial Acc. Com.,* 202 Cal. 239 [259 Pac. 1096, 54 A.L.R. 1392].) The weight to be given hearsay evidence is to be determined by the commission. If it carries conviction with the commission, it may be sufficient to uphold an award [citation], but it must be evidence of a substantial character from which the commission may deduce a reasonable inference." (*Pacific Emp. Ins. Co., supra,* 47 Cal.App.2d 494, 499-500.) Or, stated otherwise, the

administrative body "should receive as evidence and consider only the kind of relevant matter upon which responsible persons customarily rely in the conduct of serious affairs." (*Pick* v. *Santa Ana-Tustin Community Hospital* (1982) 130 Cal.App.3d 970, 980 [182 Cal.Rptr. 85].)

■ There is no evidence Dr. Merliss himself knows anything about the composition of the actual brake linings worked on at the Fordyce shop in the 1950's. Even assuming Barry made a direct statement to Dr. Merliss about asbestos exposure, there is likewise no evidence of Barry's own competence with respect to knowledge of brake lining composition. Such double or triple hearsay is not the sort of evidence upon which responsible persons customarily rely in the conduct of serious affairs. They are the untested statements or surmised statements of persons of no proven competence to make them and are in themselves insufficient to sustain findings on material facts. (Cf. Evid. Code, §§ 702, 800.)

The record is thus devoid of substantial evidence to support the finding that Barry was exposed to asbestos during his employment at Skip Fordyce from 1952 to 1957. Without a proper finding of work-related exposure to asbestos, the award cannot be sustained.

### Evidence of Causation

In view of the possibility there will be further proceedings in this case, we deem it appropriate to discuss the issue of causation of Barry's cancer. (See Code Civ. Proc., § 43.)

Fireman's Fund and Fordyce contend there is no substantial evidence, assuming Barry's exposure to asbestos, that the asbestos exposure contributed to the decedent's cancer or to his death. To the contrary, Dr. Merliss unequivocally stated, "Mr. Barry's death was caused and hastened by his exposure to asbestos during the course and scope of his employment." Dr. Padova also thought it was reasonable to conclude there was a connection between the asbestos exposure and Barry's lung cancer.

Petitioners attack these medical opinions of causation on three bases. First, they argue the medical evidence did not show ferruginous bodies existing in Barry's lungs, which would have proven positive evidence of asbestos exposure. Second, they contend Dr. Merliss' opinion does not constitute substantial evidence because certain slides were not obtained. Third, they urge any opinion based solely on statistical relationships is speculative and conjectural.

We consider these contentions in order. ■ First, the absence of evidence about ferruginous bodies in Barry's lungs is of no consequence. No

test showed that there were no ferruginous bodies in Barry's lung tissue—there was simply no evidence a test had been performed. If a test had shown the presence of such ferruginous bodies, it would have constituted positive proof of exposure to asbestos and of asbestos-related disease, but the absence of such bodies would not rule out asbestos exposure or that such exposure contributed to Barry's cancer and death. Dr. Padova testified at his deposition that "The studies that are associated statistically with coming to the conclusion that asbestos acts as a carcinogen or cigarette smoke in causing lung cancer such as this I don't have any information to suggest whether or not ferruginous bodies is important in arriving at that conclusion. In fact, many patients who have the well identified tumor due to asbestos known as mesothelioma do not have the usual objective finding of asbestosis, which I think you are talking about such as lung scarring, such as troubled breathing and other evidence of exposure to asbestos other than historical. So that, that's the issue here. I think the issue has to be historical. [¶] . . . I don't see any evidence of asbestosis in the medical records. This witness did not have any evidence of the disease known as asbestosis in the medical records." Dr. Merliss also pointed out in his report of August 1975 that "Many cases of asbestos caused cancer show no asbestosis, and many cases of asbestosis show no cancer." The presence of the ferruginous bodies in the lung tissue could have augmented the evidence of causation, but its absence does not render the evidence of causation insufficient.

As with the absence of evidence on the ferruginous bodies in the tissue, the absence of slides showing or ruling out the presence of a mesothelioma does not undermine Dr. Merliss' opinion. Dr. Merliss concluded his supplementary report with the following statement: "One other point bothers me. If you can secure a slide and submit this to a skilled pathologist, competent in the field of the identification of mesothelioma,—I will suggest several such pathologists to you if you do not have one available, since there are not very many pathologist[s] who are specially trained in the recognition of asbestotic disease of the lung and its complications—I may be able to rule in or rule out mesothelioma. This is important because mesothelioma is a one cause cancer. Should you have problems in finding a pathologist specially trained in the identification of asbestotic disease of the lung I will try to form a list for you so that you may choose one." From this statement petitioners construct the claim that Dr. Merliss had reservations about his opinion that the asbestos caused or contributed to the cancer. Petitioners misconstrue Dr. Merliss' statement. The medical evidence was that mesothelioma is caused exclusively by asbestos exposure. So, if the test had shown that the cancer was mesothelioma, it would have definitively confirmed the asbestos exposure and causation. However, the absence of proof the cancer was a mesothelioma does not exclude exposure to asbestos as a contributing cause of the cancer which did develop. Although meso-

thelioma is a cancer caused only by asbestos, asbestos does not cause only mesothelioma. Dr. Padova clearly testified that "the conclusion has been made that even in other forms of lung cancer asbestos can act as an agent known as a carcinogen, which means that asbestos when combined with a proven cancer producing agent like cigarette smoke may increase the effects of the cigarette smoke and increase the likelihood that these other forms of lung cancer will occur. . . . [I]t's my understanding that asbestos and cigarettes together have the ability to induce any of the forms of bronchogenic cancer." The lack of evidence of a test for mesothelioma does not affect the validity of Dr. Merliss' medical opinion.

■ Third, a medical opinion based on statistical correlations and relationships of probability is not "speculative and conjectural." Absolute certainty in rendering a medical opinion is not required. "[N]o higher degree of proof than well grounded opinion evidence in the light of present day medical knowledge can be obtained. To require more certainty is unreasonable . . . ." (*Wirz v. Wirz, supra,* 96 Cal.App.2d 171, 175.)

Both Dr. Merliss and Dr. Padova were of the opinion the asbestos exposure contributed to Barry's cancer based on studies which showed a correlation between asbestos exposure and incidence of cancer. Dr. Padova testified "In the history and in the analysis of some patients who have had asbestos exposure, some of these other forms of lung cancer have shown to—to be more common in the people who were exposed to asbestos and smoking cigarettes as compared to that group of patients who only smoke cigarettes. So the conclusion has been made that even in other forms of lung cancer asbestos can act as an agent known as a carcinogen, which means that asbestos when combined with a proven cancer producing agent like cigarette smoke may increase the effects of the cigarette smoke and increase the likelihood that these other forms of lung cancer will occur." He also noted that the time between the supposed asbestos exposure and the manifestation of the cancer was within the known latency period for asbestos.

Dr. Merliss in his report stated: "Asbestos is one of the most potent carcinogens known. Work done by Dr. Irving Selikoff indicates that if a man is a smoker, and is exposed to asbestos, his chances of getting lung cancer or respiratory cancer is ninety-twofold that of a man who has not smoked and has not been an asbestos worker. Men who have been asbestos workers and who smoke or do not smoke in the same proportion as the general population, have an eightfold chance of getting lung cancer compared with the general population of similar age who smoke and do not smoke in about the same proportion. [¶] Dr. Selikoff's studies on comparison of men who worked with asbestos and who have never smoked compared with men who have not worked with asbestos and have never smoked

do not yield as yet a statistically significant figure although the figures show a definite increase. Figures from England do indicate that the non-smoking asbestos workers have twice the chance of getting lung cancer than any other non-smoking man." He further stated that the studies have shown that asbestos can cause cancer even if exposure to asbestos is for minimal periods of time or if the exposure was less intense than that experienced by asbestos workers.

In the absence of any showing that the scientific studies upon which the doctors relied were conducted contrary to scientific principles, they may properly serve as a basis for rendering a medical opinion based upon reasonable medical probability.

Thus, the opinions of Dr. Merliss and Dr. Padova on the issue of causation are sufficient to constitute substantial evidence. This does not, however, preclude a different resolution upon the presentation of other or different evidence in the event of further proceedings.

*Disposition*

The order denying reconsideration and the decision and award adopted by the board are annulled. The case is returned to the board for such further proceedings as may be appropriate.

Morris, P. J., and McDaniel, J., concurred.

The petition of respondent Barry for a hearing by the Supreme Court was denied March 14, 1984. Bird, C. J., did not participate therein. Mosk, J., was of the opinion that the hearing should be granted.