[No. B050779. Second Dist., Div. Seven. Oct. 8, 1991.]

ANDRE ROUSEYROL, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, ISKENDERIAN
RACING CAMS et al., Respondents.

**COUNSEL**

Robin & Carmack and Robert Marc Robin for Petitioner.

Krimen, Hershenson, Da Silva & Daneri and Louis Harris for Respondents.

**OPINION**

**LILLIE, P. J.**—Applicant, Andre Rouseyrol, filed a petition for writ of review in which he contends respondent Workers' Compensation Appeals Board (Board) erred in denying reconsideration of an order by the workers' compensation judge (WCJ) denying applicant's request that the employer provide attendant care. When applicant was hired by respondent Iskenderian Racing Cams, he was confined to a wheelchair as a result of polio and had limited use of his left shoulder and arm. An injury sustained in the course of his employment further weakened his left upper extremity. Respondent State Compensation Insurance Fund provided the employer with workers' compensation insurance during the period of applicant's industrial injury. Upon applicant's petition, we issued a writ of review, and the Board has filed its return. We conclude the WCJ improperly denied applicant attendant care and the Board erred in denying reconsideration of the WCJ's order.

### FACTS

Applicant was employed by Iskenderian Racing Cams from September 1960 to March 1985. His duties included providing information to customers by telephone. As a result of polio, applicant's ability to use his right upper extremity was extremely limited although applicant could write with his right hand. Applicant's ability to use his left upper extremity was also impaired by polio. During his employment, applicant frequently cradled the telephone receiver between his left shoulder and ear while flipping through a manual with his left hand and writing with his right hand.

When applicant was hired and throughout his employment, applicant was unable to walk because of paralysis in his lower extremities. As a result of

that disability, when applicant was hired he was in theory 100 percent permanently disabled under the Board's criteria for evaluating permanent disabilities. (See 1 Herlick, Cal. Workers' Compensation Law Practice (4th ed. 1990) Permanent Disability Benefits, § 7.26, p. 7-24.) However, through extremely strong motivation, applicant managed to work for 25 years.

Because of applicant's prolonged awkward posture while using the telephone in the course of his duties, applicant sustained a cumulative industrial injury to his neck, left shoulder, and left arm, resulting in increased actual permanent disability. He also sustained industrial psychiatric injury. The WCJ found that the industrial injury to the neck, left shoulder, and left arm, considered alone, caused 25 percent permanent disability.

In July 1986 applicant's neck and left shoulder were further injured when his neck was in an awkward position during removal of facial moles at a dermatologist's office. In August 1986 applicant had neck surgery because of a herniated disc. The industrial injury had contributed to the need for the surgery. The surgery relieved pain, but applicant was left with weakness in the left shoulder.

Before the industrial injury, applicant was able to drive and could independently get himself out of bed and into a wheelchair, cook, bathe, dress, and use the toilet. After the neck surgery, applicant was unable to cook or to bathe or dress himself. He is unable to eat or use the toilet by himself and requires 24-hour attendant care.

Dr. James Styner concluded that the industrial injury to applicant's neck and left upper extremity was responsible for 20 percent of applicant's total disability. In a report dated May 25, 1989, Dr. Styner stated: "[Applicant] presently requires 24 hour attendant care. According to the medical records, Dr. Orfuss indicated on 10/2/86 he needed 16 hours a day home care. Although it is possible that this patient may have eventually required 24 hour attendant care absent the industrial injury, it is clear in my mind that his disability level has been increased as a result of the industrial injury and that this, in turn, has increased the need for attendant care, thus accelerating the need for 24 hour assistance. Therefore, it is my opinion that absent the industrial injury, it is not probable that Mr. Rouseyrol's condition would have deteriorated to such an extent so as to require 24 hour attendant care at this time."

In a report dated August 10, 1988, Dr. Jerrold Sherman concluded that 10 percent of the permanent disability of the neck and left shoulder was caused by the employment. On deposition in May 1989, Dr. Sherman opined

applicant requires 24-hour attendant care. Dr. Sherman stated that 20 percent of the need for the neck surgery was attributable to applicant's prolonged inclination of his neck to the left during his employment. Dr. Sherman concluded that the pain before the neck surgery "resulted in [applicant's] increased weakness and . . . inability to perform the activities that he could do prior to that bout of pain . . . ." Dr. Sherman opined that applicant was no more disabled after the neck surgery than he was by the pain that caused him to have that surgery and 10 percent of applicant's weakness in the neck, left shoulder, and left arm were caused by the employment and the neck surgery. Despite these conclusions, however, Dr. Sherman testified that the employment did not contribute to the need for attendant care.

During the deposition, Dr. Sherman was questioned and testified as follows: "Q [By applicant's attorney] Can we say with some reasonable medical probability that but for the industrial component of injury, Mr. Rouseyrol wouldn't require the attendant care at this time, necessarily? [¶] He may very well need it later on in the year, or a year from now, or two years from now, but to say that he would need it exactly at the same time in his life is speculative? [¶] A No. [¶] *I feel that his requirement of the attendant care has nothing whatsoever to do with his work activity, nor the surgery; that it would have come to pass at this time, or when he stopped the work activity, and was a year and five months prior to surgery, that he would have required attendant care as of that time.* [¶] I believe that his diminishing capabilities are due to the polio and passage of years, and that his requirement for attendant care at this time is due to the polio, passage of years, not to the work activity at Isky Cam, as he described it. [¶] Q Well, the industrial disability is an inherent ingredient in the need for that care; is it not? [¶] A No. [¶] Q How can you separate it? [¶] A Well, as I stated, the natural progression and history of polio of this degree affecting this man would have required attendant care. [¶] I would tell you that I would . . . in reflecting back, I think his wife has had an increasing activity regards [*sic*] giving him attendant care even prior to his stopping working. As I recall, she has been increasing her care for that man over a period of many years, and that it didn't just come on all of a sudden (indicating). [¶] Q But yet, he was able to work until some finite point in time; March 13, 1985? [¶] A We all work to the very limit that we can, but he was operating at a very—at the very upper limits of his stamina and work abilities to the very last. [¶] You and I, as I said previously, work at a very low level. We will only use 10, or 20 percent of our capacity for work—for strength and use of our limbs during our normal day's work. [¶] Q All right. [¶] A We . . . don't have to spend hardly any energy. There is an elevator to take us up, and you handling your pen, and me sitting here talking to you and waving my arms, requires very little energy. For that man to do what you and I are doing right now, he would be operating in the top

20 percent of his strength activities, whereas you and I are operating in our bottom 20 percent. [¶] Q All right. [¶] Now, given this fact that he was performing at his maximum physical ability to do minimum physical efforts comparable to normal activities such as you and I would do, *isn't it true, or a reasonable medical probability, that the industrial aspect of his disability, to some degree, however minimal it may be, accelerated his cessation of work?* [¶] A *I think that that's a fairly reasonable thing to say.* [¶] *I think that when a man is operating at the very top part of his capabilities, and he suffers a 10-percent disability because of his work activities, that's a—that that would be enough to—in that little period of time, to push him off.* [¶] *Not that he wouldn't have reached that point within another period of a year, or nine months, but I would agree with you that there could be some acceleration of his—he would have stopped today instead of tomorrow, because this man was putting forth a real superhuman effort to do his work activities,* and I—and, you know, I give that man all honor. [¶] Q Now, one last question, if I can. [¶] If he didn't have the industrial injury, how long could he have continued working in the future, beyond March 13, 1985? [¶] A I don't think he could have worked any longer. I don't—[¶] I think that . . . I think that he was at the end of the five months before he stopped working. [¶] Q Yet he worked five more months? [¶] A Yeah. [¶] Q So, it's really speculative to say exactly when he would stop, other than to know he did stop on March 13, 1985? [¶] A I think this man would have worked right to the very limits of his physical abilities. He was going to stop very soon, no matter when he—he would have to had decrease of activity very soon, whether he had been staying home, or whether he had been going to the work place. [¶] Q But not at the exact same date, of course? [¶]A I would be very speculative, but it was very close." (Italics added.)

Barbara Rouseyrol, applicant's wife, testified that "[m]ost of the time" before the neck surgery applicant could use a board to move himself from his wheelchair to his bed or his car. She stated that after the surgery, applicant could not do anything for himself and had to be moved from the wheelchair with a hoist.

Although, as noted, *ante*, page 1479, the WCJ found that the industrial injury to the neck, left shoulder, and left arm, considered alone, caused 25 percent permanent disability, the WCJ also found applicant does not need further attendant care on an industrial basis. In her opinion on decision, the WCJ explained her reasons for denying further attendant care as follows: "Based on the opinion of Dr. Sherman expressed in his deposition . . . , applicant is in need of attendant care. Applicant's wife testified that this need began after [the] surgery in August 1986. Dr. Sherman testified in his deposition . . . that the industrial injury contributed to the need for the

surgery and that the surgery, together with the pain and increased inactivity contributed to his inability to perform the activities that he previously could [perform]. Taking all this into consideration, the conclusion is inescapable that applicant's industrial injury was a contributing factor in his need for attendant care following the surgery. Dr. Sherman went on to testify that at the time he saw him, he would have required the same full time attendant care as a result of the natural progression of his polio residuals, that he would have required had he not worked at all. [¶] Dr. Sherman's opinion in this regard was well reasoned and did not change on cross-examination. Dr. Styner had felt that the industrial injury accelerated the need for attendant care and that it was not probable that applicant's condition would have deteriorated to such an extent that he would require attendant care at the time he saw him, absent the industrial injury. He offered no reasons for his opinion. It is therefore concluded that applicant did at one time require attendant care on an industrial basis, but that his need for this care in the future is not the result of the industrial injury. The point in time at which applicant's need for attendant care on an industrial basis ceased is not clear from the record."

Applicant petitioned for reconsideration, contending, among other things, that he is entitled to attendant care on an industrial basis for life.

In her report on applicant's petition for reconsideration, the WCJ stated: "The issue of applicant's present need for attendant care on an industrial basis was the principal issue presented in this matter. The judge felt Dr. Styner's opinion that, absent the industrial injury, it is not probable that applicant's condition would have deteriorated to such an extent so as to require 24 hour attendant care at this time, was conclusionary [sic] and possibly based on an improper premise. Dr. Styner felt that since his permanent disability had been increased as a result of the industrial injury, the need for attendant care was increased and accelerated. This is not correct. At the time that applicant had stopped working and subsequently, when his condition became permanent and stationary, he did not need attendant care. The need for attendant care resulted from a worsening of his ability to attend to his daily needs and not his ability to work. His ability to work had been lost long before the need for attendant care arose. Therefore, it is not possible to automatically say if the industrial injury was a factor in his loss of ability to work, it must automatically also be a factor in his need for attendant care. [¶] Dr. Sherman testified at length in his deposition on this subject. He discussed the fact that in a polio patient, the inability to do things that he could as a child, is a normal progression as the patient ages and his general strength and stamina deteriorate . . . and that the weakness resulting from polio more profoundly impacts the activities of daily living . . . . As a result, he concluded that the, 'natural progression and history of

polio to this degree affecting this man would have required attendant care'. . . . The judge found Dr. Sherman's reasoning to be logical and persuasive and there was not specific rebuttal from Dr. Styner."

Relying on the reports of several treating physicians, the WCJ concluded the need for attendant care arose in July 1986 following the injury in the dermatologist's office. The WCJ stated: "As it turned out, the surgery was not successful in restoring applicant's pre-July 1986 function with respect to his activities of daily living. In fact, the surgery may have even worsened his function as a result of the forced inactivity. However, it appears from the records that the need for attendant care, indicated by the lack of ability to perform toilet and feeding functions, pre-existed the surgery. [¶] Despite all this, the judge still believes that applicant was entitled to attendant care on an industrial basis for a reasonable period following the surgery. It is clear from the testimony of Dr. Sherman that the industrial injury was a component factor in the need for surgery, even though it may not have been the triggering event from a factual standpoint. Following surgery of this nature, surely applicant would have required attendant care no matter what his status might have been prior to the surgery in terms of his ability to carry out the activities of daily living."

The Board adopted the reasoning set forth in the WCJ's report and denied applicant's petition for reconsideration.

### DISCUSSION

### I

### STANDARD OF REVIEW

The appropriate standard of review in resolving an employee's challenge to the Board's decision is described in Labor Code section 5952, which states, insofar as relevant: "The review by the court shall not be extended further than to determine, based upon the entire record . . . , whether: [¶] (a) The appeals board acted without or in excess of its powers. . . . [¶] (c) *The order, decision, or award was unreasonable.* [¶] (d) The order, decision, or award was not supported by substantial evidence. [¶] (e) If findings of fact are made, such findings of fact support the order, decision, or award under review. [¶] Nothing in this section shall permit the court to hold a trial de novo, to take evidence, or to exercise its independent judgment on the evidence." (Italics added.) ▪ The court is not bound to accept the Board's findings where they are unreasonable. (*Bracken* v. *Workers' Comp. Appeals Bd.* (1989) 214 Cal.App.3d 246, 254 [262 Cal.Rptr. 537].)

## II

### DUTY TO PROVIDE ATTENDANT CARE

Labor Code section 4600 provides in pertinent part: "Medical, surgical, chiropractic, and hospital treatment, including nursing, medicines, medical and surgical supplies, crutches, and apparatus, including artificial members, which is reasonably required to cure or relieve from the effects of the injury shall be provided by the employer. . . ."

In *Granado v. Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 399 [71 Cal.Rptr. 678, 445 P.2d 294], the court stated: "There can be no doubt that medical expense is not apportionable. . . . Neither section 4600 nor any of the succeeding sections in the article of the code dealing with medical and hospital treatment state or even suggest that the employer may pay part of the expenses. So long as the treatment is reasonably required to cure or relieve from the effects of the industrial injury, the employer is required to provide the treatment, *and treatment for nonindustrial conditions may be required of the employer where it becomes essential in curing or relieving from the effects of the industrial injury itself.* [Citation.] Medical treatment unrelated to the industrial injury need not be furnished by the employer. [Citation.] If medical expense reasonably necessary to relieve from the industrial injury were apportionable, a workingman, who is disabled, may not be able to pay his share of the expenses and thus forego treatment. Moreover, the uncertainties attendant to the determination of the proper apportionment might cause employers to refuse to pay their share until there has been a hearing and decision on the question of apportionment, and such delay in payment may compel the injured workingman to forego the prompt treatment to which he is entitled." (*Id.* at pp. 405-406, italics added; accord, *Braewood Convalescent Hospital v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 165-166 [193 Cal.Rptr. 157, 666 P.2d 14]; see *Cedillo v. Workmen's Comp. Appeals Bd.* (1971) 5 Cal.3d 450, 454 [96 Cal.Rptr. 471, 487 P.2d 1039]; *Buhlert Trucking v. Workers' Comp. Appeals Bd.* (1988) 199 Cal.App.3d 1530, 1532, 1534 [247 Cal.Rptr. 190].)

■ The Board may not isolate part of a physician's opinion and disregard other parts that contradict or nullify the portion on which the Board relies. (See *Bracken v. Workers' Comp. Appeals Bd., supra,* 214 Cal.App.3d at p. 255.) "[A] physician's report and testimony must be considered as a whole rather than in segregated parts; and, when so considered, the entire report and testimony must demonstrate the physician's opinion is based upon reasonable medical probability. [Citations.]" (*Ibid.*)

■ In the present case, the WCJ and Board focused on Dr. Sherman's testimony that, absent the industrial injury, natural progression of the polio

would have resulted in a need for 24-hour attendant care. However, in concluding the industrial injury did not contribute to the need for ongoing attendant care, the WCJ and Board failed to adequately consider Dr. Sherman's opinion that "the industrial aspect of [applicant's] disability, to some degree, however minimal it may be, accelerated his cessation of work." In view of the unchallenged finding that the industrial injury to the neck, left shoulder, and left arm, considered alone, caused 25 percent permanent disability, Dr. Sherman's initial conclusion that the industrial injury did not contribute to the need for 24-hour attendant care is simply not reasonable. The industrial component of applicant's permanent disability involves increased weakness of the neck and left upper extremity. It is undisputed that weakness of the neck and left upper extremity contributes to the need for 24-hour attendant care.

■ Once it has been established that an industrial injury contributed to an employee's need for medical treatment, including attendant care, employer-provided medical treatment is mandated by Labor Code section 4600. The operation of that section cannot be avoided by apportioning the entire need for attendant care to nonindustrial causes on the theory that, despite industrial contribution to the need for attendant care, natural progression of a preexisting disease would have resulted in a need for the same level of care at the present time even if there had been no industrial injury. In view of Dr. Sherman's opinion that the industrial injury contributed to applicant's current level of permanent disability and his severely decreased ability to function, the WCJ and Board erred in determining that applicant does not need further attendant care.

### DISPOSITION

The May 31, 1990, order of respondent Workers' Compensation Appeals Board denying applicant's petition for reconsideration is annulled, and the matter is remanded to respondent Board to grant applicant's petition for reconsideration, to find applicant needs further 24-hour attendant care on an industrial basis for life, and to conduct further proceedings consistent with the views expressed herein.

Petitioner, Andre Rouseyrol, shall recover his appellate costs.

Johnson, J., and Woods (Fred), J., concurred.

Respondents' petition for review by the Supreme Court was denied January 8, 1992. Baxter, J., was of the opinion that the petition should be granted.