[No. B074124. Second Dist., Div. One. Jan. 26, 1994.]

CARLOS RODRIGUEZ, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, JERSEYMAID
MILK PRODUCTS et al., Respondents.

1748

COUNSEL

Ray & Ray, Peter J. Ray and Sara Smith Ray for Petitioner.

Scott Z. Silver for Respondents.

OPINION

ORTEGA, J.—The workers' compensation judge (WCJ) found that petitioner, Carlos Rodriguez (applicant), sustained an industrial injury to his right knee, back, and right foot during his employment by respondents Jerseymaid Milk Products and the Vons Companies, Inc., that applicant did not sustain an industrial psychiatric injury, and that applicant does not need further medical treatment to cure or relieve the effects of the industrial injury. We affirm the order by respondent Workers' Compensation Appeals Board (Board) denying reconsideration of the WCJ's findings.

BACKGROUND

On December 15, 1989, applicant, 23 years old, sustained an industrial injury to his right knee, back, and right foot when his right foot, ankle, and knee were crushed by a pallet jack during his employment as an order filler and cleanup worker by Jerseymaid and Vons. Applicant's last date of work was approximately December 30, 1989.

In a report to Vons dated April 23, 1990, Dr. Robert Ghatan, an orthopedist, concluded that applicant had a posttraumatic autonomic dysfunction of his right foot. Dr. Ghatan stated that the cause of autonomic dysfunction is unclear and that autonomic dysfunction occurs mostly in patients with certain types of personality even with trivial injuries. However, Dr. Ghatan stated that applicant's injury to the right foot appeared to have been significant enough to cause prolonged symptoms. Dr. Ghatan found that applicant was temporarily partially disabled as a result of the industrial injury to his foot and was not then capable of performing his usual work. Dr. Ghatan stated that applicant should be able to work in a job at which he could sit and keep his foot elevated. Dr. Ghatan explained that if applicant had to walk or stand at work, applicant "will not be able to work for some time to come." Dr. Ghatan noted that applicant had been receiving physical therapy consisting of ultrasound, whirlpool, exercises, and massage and that applicant stated that the ultrasound increased his pain. Dr. Ghatan recommended that

ultrasound be discontinued and that applicant receive physical therapy that included exercises in a swimming pool, use of a bicycle, and transcutaneous electrical nerve stimulation.

On July 10, 1990, Dr. Philip Macon, another orthopedist, reported to applicant's attorney that, as a result of the industrial injury to the right foot, applicant had tendinitis in his right foot and a chronic right ankle sprain. Dr. Macon found that applicant was permanently precluded from repetitive kneeling, squatting, climbing, and walking over uneven terrain. Dr. Macon stated that applicant asserted his duties at work included standing for two hours; walking for one hour; continuous stooping, crouching, bending, and squatting; frequent kneeling; and occasional lifting of objects that weigh at least one hundred pounds. Dr. Macon stated that applicant is not capable of performing that job and that applicant should receive vocational rehabilitation if his description of his duties is accurate. Dr. Macon further stated that applicant should receive further medical care consisting of physical therapy and analgesic and anti-inflammatory medication if he has exacerbations of his symptoms.

On July 25, 1990, Dr. Ghatan reported that applicant had not received the appropriate treatment for his condition and that the treatment previously recommended by Dr. Ghatan should be provided. Dr. Ghatan concluded that applicant was temporarily partially disabled and should avoid prolonged standing and walking.

Sometime before August 29, 1990, applicant requested vocational rehabilitation, relying on Dr. Ghatan's April 23, 1990, report and Dr. Macon's July 10, 1990, report. On December 3, 1990, applicant and Esther Jacobs, the qualified rehabilitation representative, signed a vocational rehabilitation plan that provided for applicant to receive training to become an electronics technician and to receive approximately two months of placement services. The plan stated that the commencement date of the plan was November 5, 1990, that the expected completion date for training was June 28, 1991, and that the expected completion date for placement assistance was August 30, 1991. The plan specified that the employer was required to provide all necessary vocational rehabilitation services and benefits. The plan was signed by applicant's attorney on January 10, 1991. The copy of the plan in the Board's certified record does not contain the signatures of the employers and their attorney.

The parties selected Dr. Michael Patzakis as an agreed medical examiner in orthopedics. On November 8, 1990, several days after the proposed commencement date of the vocational rehabilitation plan, the parties sent a

letter to Dr. Patzakis, requesting that he examine applicant, review the medical records, and prepare a report on various issues, including whether applicant needed vocational rehabilitation and further medical treatment.

On February 4, 1991, Dr. Patzakis reported that applicant had suffered a contusion to his right foot, ankle, and lower leg, that he had a chronic low back sprain, and that he had a psychophysiological reaction with his musculoskeletal system. Dr. Patzakis noted that X-rays and magnetic resonance imaging (MRI) scans of the right ankle and right foot and an MRI scan of the lumbar spine were normal and that applicant had no atrophy. Dr. Patzakis stated that there were no objective findings of disability. Based on applicant's symptoms, Dr. Patzakis found that applicant was permanently precluded from very heavy lifting, walking on uneven surfaces, using his right foot for repetitive foot controls, and prolonged and repetitive squatting.

Dr. Patzakis stated that applicant had constant minimal lower back pain, "increasing to slight [and] becoming moderate with very heavy lifting." Dr. Patzakis found that applicant had constant minimal right foot and ankle pain, "increasing to slight [and] becoming moderate with activity above the work restriction[s] [that Dr. Patzakis imposed]." Dr. Patzakis stated that applicant had intermittent minimal right knee pain.[1]

Dr. Patzakis did not recommend any further medical care for applicant's orthopedic condition. However, Dr. Patzakis recommended that applicant be evaluated by an agreed or independent medical examiner in psychiatry. Dr. Patzakis explained that applicant was "grossly exaggerating his complaints" and that Dr. Patzakis did not know whether applicant was consciously doing so for secondary gain or whether the exaggeration was subconscious.

Dr. Patzakis noted that an analysis of applicant's job indicated that applicant was required to carry up to 20 pounds, lift 30 to 60 pounds, use hooks to push and pull a 360-pound stack of milk cases, stand 5 percent of the time, and sit about 45 percent of the time. Dr. Patzakis stated that, from an orthopedic standpoint, applicant was capable of performing his usual duties as a cleanup worker if he were motivated to do so.

The record reflects that applicant had begun receiving training under the vocational rehabilitation plan in November 1990, that the employers paid for

---

[1]The terms minimal, slight, and moderate are terms of art. California Code of Regulations, title 8, division 1, chapter 4.5, section 9727 provides in pertinent part: ". . . The terms shown below are presumed to mean the following: [¶] . . . [¶] 2. A *moderate* pain could be tolerated, but would cause marked handicap in the performance of the activity precipitating the pain. [¶] 3. A *slight* pain could be tolerated, but would cause some handicap in the performance of the activity precipitating the pain. [¶] 4. A *minimal* (mild) pain would constitute an annoyance, but causing no handicap in the performance of the particular activity, would be considered as nonratable permanent disability." (Italics in original.)

the training, and that the employers initially provided vocational rehabilitation temporary disability indemnity (VRTD) and reimbursed applicant for his mileage to attend the classes.[2] However, in March 1991, based on Dr. Patzakis's report, the employers stopped paying VRTD and reimbursement for mileage to the vocational training classes. After discontinuing VRTD payments, the employers provided permanent disability advances until about June 1991.

In a deposition on April 17, 1991, Dr. Patzakis testified that, if the force required to push or pull a 360-pound stack of milk cases is equivalent to the force needed to lift 100 pounds, applicant is not capable of performing that duty. On questioning by applicant's attorney regarding whether there was a need for further medical treatment, the following colloquy occurred: "Q Any other medical care indicated in the case other than the psychiatrist? [¶] A I think that is the main thing. One of the problems is that this is something that is really clouding his situation to a very marked degree. [¶] Q There is nothing else you think he needs orthopedically or even over the counter or anything? [¶] A Well, I think he would require over-the-counter medication such as Tylenol, Motrin, aspirin. [¶] Q No physical therapy or chiropractic treatment? [¶] A No. [¶] Q Surgery or any other kind of— [¶] A Everything is normal, so there is not anything indicated."

On April 19, 1991, the vocational rehabilitation plan was submitted to the rehabilitation unit. On June 24, 1991, the rehabilitation unit served Vons and defense counsel with notice that the rehabilitation unit had found that applicant was a qualified injured worker, that the rehabilitation unit approved the vocational rehabilitation plan, and that the employers were required to provide all necessary services and benefits under the approved plan. Defense counsel had moved to a new location in February 1991. The record is silent as to whether defense counsel notified the rehabilitation unit of counsel's new address and, if so, whether the rehabilitation unit served

---

[2]On the date of injury, Labor Code section 139.5, subdivision (c), provided: "When a qualified injured worker chooses to enroll in a rehabilitation program, he or she shall continue to receive temporary disability indemnity payments, plus additional living expenses necessitated by the rehabilitation program, together with all reasonable and necessary vocational training, at the expense of the employer or the insurance carrier, as the case may be." (Stats. 1982, ch. 922, § 2, p. 3365.)

California Code of Regulations, title 8, division 1, chapter 4.5, section 10003, subdivision (c), provides: " 'Qualified injured worker' means an employee: [¶] (1) The [effects] of whose injury, whether or not combined with the effects of a prior injury or disability, if any, permanently preclude, or are likely to preclude[,] the employee from engaging in his or her usual and customary occupation or the position in which he or she was engaged at the time of injury (hereinafter referred to as 'medical eligibility'); and [¶] (2) Who can reasonably be expected to return to suitable gainful employment through the provision of vocational rehabilitation services (hereinafter referred to as 'vocational eligibility')."

defense counsel at the new address. The employers did not appeal to the WCJ from the order approving the rehabilitation plan.

About July 25, 1991, applicant requested that the rehabilitation unit order the employers to resume paying vocational rehabilitation benefits. At a conference held in November 1991, applicant asserted that the job analysis indicates that applicant was required to push stacks of milk cases without using hooks. Applicant noted that the force required to push or pull stacks of milk cases was not measured. Applicant also asserted that he was required to lift milk cases that weighed more than 120 pounds and was required to push and pull 420 pounds. A representative for Vons attended the conference. Vons asserted that, because Dr. Patzakis reviewed the job analysis and found that applicant could perform his usual duties, applicant was not a qualified injured worker.

On December 5, 1991, the rehabilitation unit found that applicant's duties as an order filler exceeded the work restrictions on lifting and carrying imposed in Dr. Patzakis's report. The rehabilitation unit found that applicant is entitled to "all vocational rehabilitation benefits from the last date paid and continuing until plan completion." On March 10, 1992, the WCJ imposed a penalty on the employers under Labor Code section 5814 because the employers had unreasonably failed to pay VRTD after the rehabilitation unit approved the rehabilitation plan.[3]

On October 23, 1991, Dr. Thomas Curtis, a psychiatrist, reported to applicant's attorney that applicant had a posttraumatic stress disorder with depression and somatization, "psychological factors affecting [his] physical condition (stress-related headache, neck/shoulder/back muscle tension/pain problems, peptic acid problems and chest pain)," and a psychogenic pain disorder. (Capitalization omitted.) Dr. Curtis stated that applicant was about to be evicted from his home, that applicant had gained about 30 pounds since the date of injury, that applicant had disturbed sleep patterns, that applicant was irritable, and that applicant stated he had anxiety and problems with his concentration and memory. Dr. Curtis reported that applicant's parents got divorced when applicant was seven but that they remarried six years later. Dr. Curtis stated that applicant's alcohol consumption had increased to six to

---

[3]Labor Code section 5814 provides in pertinent part: "When payment of compensation has been unreasonably delayed or refused, either prior to or subsequent to the issuance of an award, the full amount of the order, decision or award shall be increased by 10 percent. . . ."

The Supreme Court has construed Labor Code section 5814 as requiring that the penalty be assessed against the entire amount ultimately awarded for the class of benefits unreasonably delayed or withheld. (*Rhiner* v. *Workers' Comp. Appeals Bd.* (1993) 4 Cal.4th 1213, 1225-1228 [18 Cal.Rptr.2d 129, 848 P.2d 244]; *Gallamore* v. *Workers' Comp. Appeals Bd.* (1979) 23 Cal.3d 815, 826-827 [153 Cal.Rptr. 590, 591 P.2d 1242].) The WCJ assessed the penalty against VRTD.

twelve beers a day but that, during the last few weeks, applicant had decreased his consumption to about three beers a day. Dr. Curtis further stated that, when applicant was 17, applicant had been charged with driving under the influence and had attended Alcoholics Anonymous for about three months.

Dr. Curtis concluded that applicant sustained an industrial psychiatric injury that resulted in temporary disability and a need for psychotherapy. Dr. Curtis anticipated that, after applicant received psychotherapy, applicant would have "slight-to-moderate-to-moderate" psychiatric permanent disability. Dr. Curtis anticipated that applicant would have a slight impairment of the abilities to comprehend and follow instructions, perform simple and repetitive tasks, influence people, make generalizations, evaluations, and decisions, and accept and carry out responsibility, a slight to moderate impairment of the ability to perform complex and varied tasks, and a moderate impairment of the abilities to maintain a proper work pace and relate to other people. Dr. Curtis noted that applicant was successfully completing a vocational rehabilitation program in engineering electronics. Dr. Curtis stated that applicant is psychiatrically unable to perform duties similar to those he performed when he was injured because he has had a strong posttraumatic emotional reaction to the physical injury. Dr. Curtis stated that applicant would be provided with "individual and/or group psychotherapy sessions" at Dr. Curtis's office to relieve problems including pain intolerance, stress-related psychophysiological reactions, and insomnia. Dr. Curtis also stated that applicant would be provided with biofeedback for pain control and physical symptoms that are increased by stress.

On December 16, 1991, Dr. Bernard Kirzner, another psychiatrist, reported to defense counsel that applicant liked his job until Vons acquired Safeway in September 1989. After that occurred, applicant was concerned that new employees were improperly trained and were careless. Applicant told Dr. Kirzner that, after the date of injury, he had auditory and visual hallucinations. Applicant informed Dr. Kirzner that he drank "up to a twelve[-]pack or more per day," but had recently reduced his alcohol consumption to one or two drinks of beer per week. Applicant's wife had threatened to leave him if he did not stop drinking. Applicant stated that, when he was working for Vons and Jerseymaid, he had two or three beers at lunch. Dr. Kirzner stated that applicant's mother had recently been hospitalized for depression.

Dr. Kirzner concluded that applicant had a history of alcoholism and that applicant was malingering. Dr. Kirzner stated it was possible but unlikely that applicant had a somatoform disorder (a psychogenic pain syndrome).

Dr. Kirzner concluded that applicant did not sustain an industrial psychiatric injury. Dr. Kirzner further stated that, even if applicant had an industrially caused somatoform disorder, he did not have any temporary or permanent disability beyond that described by Dr. Patzakis. Dr. Kirzner stated that applicant had a minimal impairment of the abilities to maintain an appropriate work pace, perform complex or varied tasks, relate to other people beyond giving or receiving instructions, influence people, and make generalizations, evaluations, or decisions without immediate supervision. Finally, Dr. Kirzner concluded that the best "treatment" for applicant would be for him to return to work and end the workers' compensation litigation.

Dr. Cynthia Ruth was appointed as the independent medical examiner in psychiatry. In her report, which was dated July 22, 1992, Dr. Ruth noted that applicant stated that he was evicted from his home because the insurer stopped paying his workers' compensation benefits but that he obtained a new home with his father's assistance and had been renting that home for six months. Applicant told Dr. Ruth that, when he was seven, he was abandoned by his father. Applicant also told Dr. Ruth that, when he was 12, he lived in a violent neighborhood and was often assaulted in school and that he was " 'kicked . . . out' " of school after he assaulted a teacher.

Regarding the vocational rehabilitation in electronic engineering, Dr. Ruth noted that applicant stated: " '. . . People don't want to pay you what you're worth, only $6.00 an hour and part-time, no benefits. The market is really hard. . . .' " She noted, however, that, at another point during the psychiatric examination, applicant said: " 'I have applied for over 50 jobs and nothing from any of them. People no longer want entry level, only people who have experience. . . .' " Dr. Ruth noted it was unclear whether applicant refused offers of part-time employment or whether he received no job offers. Applicant also told Dr. Ruth that he had recently enrolled in a six-week course to become an emergency medical technician but had stopped attending the classes after four weeks because he did not like the instructor. Applicant indicated he planned to take a six-month course to become a paramedic because the course would help him avoid dwelling on his problems. He told Dr. Ruth that he loved electronics and computers. At home he often worked on his computer and tried to repair a radio or videocassette recorder.

Applicant told Dr. Ruth that he was always nervous and tense, he had trouble sleeping, and he had less motivation than before the accident. Dr. Ruth noted that applicant was receiving excellent grades in the vocational rehabilitation training until he was evaluated by Dr. Patzakis. He told Dr.

Ruth that he became depressed when the insurer reduced his benefits and that worrying about financial matters interfered with his concentration.

Applicant informed Dr. Ruth that at night he sometimes has visual or auditory hallucinations. Dr. Ruth stated that applicant's mother and grandmother had psychiatric problems and that applicant had a strong family history of alcoholism. Applicant told Dr. Ruth that he had recently been drinking but that he never had a problem with alcohol. She noted that applicant's assertions regarding lack of alcohol abuse were inconsistent with the history obtained by Dr. Curtis.

Dr. Ruth diagnosed an anxiety disorder, psychological factors affecting applicant's physical condition, and dysthymia. She stated that applicant had a minimal impairment of the ability to perform simple and repetitive tasks, a slight impairment of the abilities to relate to other people beyond giving and receiving instructions and to influence people, and a slight to moderate impairment of the abilities to make generalizations, evaluations, and decisions without immediate supervision and to accept and carry out responsibility for direction, control, and planning. She found that applicant had a minimal to slight psychiatric disability and that he was capable of performing his usual duties as an order filler. Dr. Ruth stated that alcoholism probably caused or contributed to applicant's depression and that any hallucinations may have been withdrawal symptoms.

Dr. Ruth stated that, despite applicant's pain, applicant was highly motivated, highly functional, and doing extremely well in his vocational rehabilitation course until his vocational rehabilitation benefits were terminated. Dr. Ruth, therefore, concluded that applicant did not sustain an industrial psychiatric injury. Dr. Ruth stated that, after applicant was notified that he was no longer a qualified injured worker, he had multiple symptoms of anxiety and depression and complaints of chronic pain. Dr. Ruth stated that applicant needs psychiatric treatment, that the extent of his current alcohol dependence needs to be determined, and that alcohol detoxification may be necessary. She stated that applicant may benefit from psychiatric pharmacotherapy. Dr. Ruth opined that, if applicant receives appropriate psychiatric treatment and becomes employed, his psychiatric condition should return to the functional state that preceded the orthopedic injuries.

The WCJ found that applicant sustained an industrial injury to his right knee, right foot, and back but that he did not sustain an industrial psychiatric injury. The WCJ found that the industrial injury resulted in 23½ percent permanent disability. The WCJ also found that further medical treatment to cure or relieve applicant from the effects of the injury was not required. The

WCJ explained that he based his finding of no industrial psychiatric injury on Dr. Ruth's report and that he relied on the reports of Drs. Patzakis and Ruth in finding that applicant does not need further medical treatment to cure or relieve him from the effects of the industrial injury.

Applicant petitioned for reconsideration. In his report on applicant's petition, the WCJ recommended that reconsideration be granted. The WCJ stated that, because applicant's psychiatric reaction occurred as a result of the termination of VRTD, applicant sustained an industrial psychiatric injury. The WCJ further stated that, because Dr. Patzakis testified that applicant needs Tylenol, Motrin, or aspirin, there is a need for further medical care limited to such over-the-counter medications.

The Board denied reconsideration. Regarding the issue of whether applicant sustained an industrial psychiatric injury, the Board stated: "Applicant's psychiatric injury was precipitated in part by his reaction to the litigation process to determine his entitlement to benefits. His reaction was not to any medical treatment necessitated by some specific industrial exposure, or other factor related to his employment. Rather it was a part of the process of litigation and not connected to his work activities, medical treatment for an industrial condition or a compensable consequence of his original industrial injury. Finding his injury to be a compensable consequence of his orthopedic injury in this instance would be analogous to finding injury based upon a similar reaction to a determination that he suffered no permanent disability or need for further medical treatment. Such a link between injury and employment is too attenuated to support a finding that his psychiatric injury is a compensable consequence of his orthopedic injury." On the issue of whether applicant needs further medical treatment, the Board, relying on *Taylor* v. *Workers' Comp. Appeals Bd.* (1981) 46 Cal.Comp.Cases 506, stated: "We disagree that a need for non-prescription analgesics, such as aspirin, is sufficient to support a finding of need for further medical treatment. [Citation.]"

Applicant petitioned for, and we have issued, a writ of review. ▉ Applicant contends that, because Dr. Patzakis testified that applicant needs over-the-counter medicine, substantial evidence does not support the finding that applicant does not need further medical treatment on an orthopedic basis. ▉ Citing *Detjen* v. *Workmen's Comp. Appeals Bd.* (1974) 42 Cal.App.3d 470 [116 Cal.Rptr. 860], applicant also contends that, because Dr. Ruth found that applicant's psychiatric injury occurred when applicant's vocational rehabilitation benefits were discontinued and the Board relied on Dr. Ruth's opinion, the psychiatric injury was a compensable consequence of the original industrial injury.

DISCUSSION

I

 Labor Code section 4600 provides in pertinent part: "Medical . . . treatment, including . . . medicines, . . . which is reasonably required to cure or relieve [the injured worker] from the effects of the injury shall be provided by the employer. . . ." Labor Code section 4600 does not specify whether the employer's duty to provide medicines includes a duty to provide over-the-counter analgesic medications.

In *Taylor* v. *Workers' Comp. Appeals Bd.*, *supra*, 46 Cal.Comp.Cases 506, the Board concluded that there is no duty to provide over-the-counter medications. In that case, the WCJ and Board relied on the report of an independent medical examiner in determining whether there was a need for further medical treatment. The independent medical examiner reported that the worker required no more than " 'home type physical therapy' " and buffered aspirin and that there was no indication for diagnostic studies or surgery. (*Id.* at p. 507.) In his deposition, the independent medical examiner stated that the worker would have exacerbations and might need professional physical therapy for an exacerbation if recommended by a physician. The WCJ found that the worker did not need further medical treatment, and the Board affirmed that finding.

Labor Code section 3202 provides that division 4 of the Labor Code, which includes Labor Code section 4600, shall be liberally construed to extend benefits to industrially injured workers, and the Supreme Court has stated that the Legislature intended that Labor Code section 4600 be liberally construed in favor of the worker's right to obtain reimbursement. (*McCoy* v. *Industrial Acc. Com.* (1966) 64 Cal.2d 82, 86-87 [48 Cal.Rptr. 858, 410 P.2d 362]; accord, *Smyers* v. *Workers' Comp. Appeals Bd.* (1984) 157 Cal.App.3d 36, 42-43 [203 Cal.Rptr. 521] [holding that in some cases the employer must provide housekeeping services as part of its duty to provide medical treatment to relieve the worker from the effects of the industrial injury].) We need not determine whether Labor Code section 4600 would ever require the employer to provide over-the-counter analgesic medication, because in the present case Dr. Patzakis's opinion does not constitute substantial evidence that any over-the-counter analgesic medication is reasonably required to cure or relieve applicant from the effects of the industrial injury. In relying on a physician's opinion, the Board may not isolate a fragmentary portion of the physician's report or testimony and disregard other parts that contradict or

nullify that portion. (*Bracken* v. *Workers' Comp. Appeals Bd.* (1989) 214 Cal.App.3d 246, 255 [262 Cal.Rptr. 537].) Dr. Patzakis stated that there were no objective findings of disability, that neither physical therapy, chiropractic treatment, nor surgery was needed because everything was normal, and that applicant was grossly exaggerating his complaints. Under these circumstances, Dr. Patzakis's vague statement that applicant "would require over-the-counter medication such as Tylenol, Motrin, [or] aspirin" does not constitute substantial evidence that would support an award of further medical treatment limited to reimbursement for over-the-counter analgesic medication. The Board properly determined that the employers are not required to provide any further medical treatment for applicant's orthopedic condition.

## II

In support of the contention that the Board erred in finding that applicant did not sustain an industrial psychiatric injury, applicant relies on case law that an injury sustained during participation in vocational rehabilitation may be a compensable consequence of the original industrial injury. In *Rodgers* v. *Workers' Comp. Appeals Bd.* (1985) 168 Cal.App.3d 567 [214 Cal.Rptr. 303], a worker who had claimed industrial injuries to his back received vocational rehabilitation. While participating in the vocational rehabilitation program, the worker injured his back. Before the injury during rehabilitation occurred, the worker entered into a compromise and release settling both claims, and the compromise and release was approved by the WCJ. The court held that the injury sustained during participation in the vocational rehabilitation program was a compensable consequence of the original industrial injuries and that, in view of the language of the compromise and release, the Board had erred in determining that the compromise and release barred the worker's claim for the injury sustained during participation in that program. (*Id.* at pp. 574-576.) In *Carter* v. *County of Los Angeles* (1986) 51 Cal.Comp.Cases 255 (in bank), the Board stated that there is no public policy against releasing liability for a future injury that may occur during vocational rehabilitation and that is a compensable consequence of the original industrial injury. (*Id.* at p. 258.) The Board explained that a compensable consequence of the original industrial injury is "a secondary incident which, although perhaps a new and distinct injury, is not a new and independent injury but rather the direct and natural consequence of the primary incident. [Citations.]" (*Ibid.*)

In the present case, however, the psychiatric injury found by Dr. Ruth, on whose opinion the Board relied, did not occur as a result of any activity involved in the vocational rehabilitation program. Dr. Ruth found that the

psychiatric injury occurred because applicant learned of Dr. Patzakis's opinion that applicant was not a qualified injured worker and because the employers relied on Dr. Patzakis's opinion and stopped paying vocational rehabilitation benefits. Thus, the injury occurred as a result of the litigation process.

Applicant urges this court to follow *Detjen* v. *Workmen's Comp. Appeals Bd.*, *supra*, 42 Cal.App.3d 470, in which the court held that a psychiatric injury sustained because of an employee's reaction to a letter regarding her petition to reopen her workers' compensation case was a compensable industrial injury. (*Id.* at pp. 476-477.) We disagree with the holding in *Detjen*, and our research has not located any published California appellate case relying on that holding. We agree with the Board's conclusion that an employee's reaction to an agreed medical examiner's opinion and the reliance of an employer or insurer on that opinion are not compensable consequences of the original industrial injury. (Cf. *Motorola, Inc.* v. *Industrial Com'n* (1980) 125 Ariz. 211 [608 P.2d 788] [psychiatric injury that occurred because the treating physician reported that the employee was no longer disabled as a result of her industrial back injury and because the insurer stopped paying benefits was not a compensable industrial injury].)[4]

---

[4]At oral argument, applicant asserted that *Cooper* v. *Workers' Comp. Appeals Bd.* (1985) 173 Cal.App.3d 44 [218 Cal.Rptr. 783] is analogous to the present case. In *Cooper*, an employee was exposed to asbestos at work and was misdiagnosed as having asbestosis. The employer paid for the medical examination. However, the workers' compensation application was not filed until after the employee was diagnosed as having asbestosis. An independent medical examiner stated that the employee sustained a psychiatric injury as a result of the misdiagnosis. The WCJ found that the psychiatric injury was work-related, but the Board annulled that decision, stating that the record was insufficient to support the WCJ's finding. Relying on Labor Code section 3202, Division Seven of this court held that the psychiatric injury was compensable because it arose out of an employment-related diagnosis of asbestosis. (*Cooper* v. *Workers' Comp. Appeals Bd.*, *supra*, 173 Cal.App.3d at pp. 48-50.)

Presiding Justice Lillie dissented, observing that Labor Code section 3202.5 provides that Labor Code section 3202 does not relieve a party from meeting the party's burden of proof. (*Cooper* v. *Workers' Comp. Appeals Bd.*, *supra*, 173 Cal.App.3d at p. 51 (dis. opn. of Lillie, P. J.).) She further noted that the allegedly injured worker has the burden of proving by a preponderance of the evidence that the alleged injury arose out of and occurred in the course of employment. (*Id.* at p. 50.) Because the psychiatric injury was not precipitated by any condition at work, Presiding Justice Lillie concluded that the Board properly determined that the applicant did not meet his burden of proof. (*Id.* at p. 51.)

*Cooper* is distinguishable from the present case because in *Cooper* the psychiatric injury did not occur as the result of a medical opinion obtained during workers' compensation litigation. Moreover, in view of Labor Code section 3202.5, we believe the majority in *Cooper* erred in relying on Labor Code section 3202 in determining that the psychiatric injury was proximately caused by the employment.

## DISPOSITION

Respondent Workers' Compensation Appeals Board's February 4, 1993, order denying reconsideration is affirmed.

Spencer, P. J., and Masterson, J., concurred.

Petitioner's application for review by the Supreme Court was denied April 28, 1994. Mosk, J., was of the opinion that the application should be granted.