Filed 12/9/13  South Coast Framing v. WCAB CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SOUTH COAST FRAMING, INC. et al., <br><br> Petitioners, <br><br> v. <br><br> WORKERS' COMPENSATION APPEALS BOARD et al., <br><br> Respondents. | D063945 <br><br> (WCAB No. ADJ7324566) |


Petition for writ of review from an order of the Workers' Compensation Appeals Board.  Order annulled and the matter remanded.


Bradford & Barthel and Louis A. Larres for Petitioners.

Law Offices of O'Mara & Hampton and Daniel J. Palasciano for Respondents.

A workers' compensation judge (WCJ) concluded that Brandon Clark, an employee of South Coast Framing, Inc. (South Coast), died as a result of medications he took after suffering an industrial injury.  South Coast and its insurance carrier, Redwood Fire and Casualty Company administered by Berkshire Hathaway Homestate Companies

(together with South Coast, petitioners), petitioned for writ of review after the Workers' Compensation Appeals Board (the Board) denied reconsideration of the WCJ's decision in favor of Brandon's wife and children. We conclude the Board erred in denying reconsideration because the WCJ's decision was not supported by substantial evidence. Accordingly, the order denying reconsideration is annulled and the matter is remanded to the Board with directions to enter a new order denying the claim.

FACTUAL AND PROCEDURAL BACKGROUND

In 2008, Brandon suffered back, head, neck and chest injuries when he fell from a roof while working for South Coast. Brandon's workers' compensation physician prescribed amitriptyline, gabapentin (Neurontin) and hyrdrocodone (Vicodin) for his injuries. Brandon was also taking Xanax and Ambien, which were prescribed by his personal physician in January 2009. Xanax was prescribed for "ongoing anxiety," and Ambien was prescribed for sleeping difficulties. Brandon's personal physician noted that Brandon was "having problems sleeping. This [was] occurring at least 3 or 4 times a week . . . . During these times, [Brandon was] not aware of anxiety or . . . pain."

In July 2009, Brandon died from the combined effects of amitriptyline, gabapentin, Xanax and Ambien, and associated early pneumonia. Brandon's wife, Jovelyn Clark, and their three minor children filed a claim for death benefits alleging the death was the result of the injury and industrially prescribed medications.

Petitioners requested an opinion from Dr. Daniel Bressler regarding the cause of Brandon's death. After reviewing various medical records, Dr. Bressler concluded that "[Brandon's] death was secondary to an accidental overdose." In reaching this conclusion, Dr. Bressler stated, "[t]he specific combination of medicines [Brandon] was on, which included Xanax, Ambien, Flexeril, Neurontin, amitriptyline, and hydrocodone, all separately and in combination had the capacity to induce respiratory depression, and even respiratory arrest."

Dr. Thomas C. Bruff, an agreed medical examiner, reviewed Brandon's medical file, including autopsy and toxicology reports. Based on the records, Dr. Bruff issued his report, stating:

> "While there is some difference of opinion on therapeutic and toxic levels of the medications in this particular case, several conclusions can be made. While [Brandon] was prescribed a number of medications only amitriptyline, zolpidem, alprazolam, gabapentin, and acetaminophen were found in peripheral blood specimen. Gastric specimens showed both alprazolam and zolpidem. It is my opinion that gabapentin did not have a role in this particular case. Amitriptyline was prescribed in such low dose, and bloods levels show that the medication was likely taken as prescribed. However, zolpidem [(Ambien)] and alprazolam [(Xanax)] was found in excess of what would be normally considered peripheral blood concentrations. Both these medications work in a similar fashion and would be considered at least additive in their effects. It is my opinion in the case of [Brandon] that it is just this additive effect of zolpidem and alprazolam that caused sedation significant enough to result in the events leading to his death.
>
> "For clarity, it is my opinion that [Brandon] passed away as a result of the additive drug interaction between zolpidem and alprazolam. The two additional medications present in the bloodstream, gabapentin and amitriptyline, were not high enough to result in any coincident drug interaction."

3

During his deposition, Dr. Bruff clearly stated that gabapentin did not play a role in Brandon's death. In regard to amitriptyline, Dr. Bruff stated that while this drug was found in Brandon's bloodstream, it was not enough by itself to be toxic. However, Dr. Bruff noted that mixtures of drugs are difficult to quantify.

When questioned regarding whether amitriptyline *could* have contributed to Brandon's death, Dr. Bruff stated that "it's possible." He testified that amitriptyline "is additive" and "could be an incremental contributor," but alprazolam and zolpidem "carried the day." Dr. Bruff stressed that he could not precisely calculate the percentage of amitriptyline's contribution because "honestly, no medical person—it would be closing your eyes and throwing a dart at a dartboard kind of stuff. Maybe you get a bull's eye. You are just pulling numbers out of the sky." When further pressed for a percentage, Dr. Bruff stated that amitriptyline was part of the causation "pie," but he could not " 'tell . . . whether it's 1.5 percent or .5 percent.' . . . [W]e're way down at that end." Additionally, Dr. Bruff testified that hydrocodone, which was detected in Brandon's urine, could be "a couple crumbs" of the causation "pie." He clarified that while amitriptyline had a small role in Brandon's death, he stood by his initial report.

Dr. Bruff also commented on records relating to Brandon's sleeping problems. Dr. Bruff noted that the records did not reveal why Brandon was having trouble sleeping but stated that "[i]t could be because of back pain, could be, you know, stress at home. [The records] didn't seem to be detailed for me, so I don't know. I deal with a lot of cases of chronic back pain and what not and sleeping can be an issue." Jovelyn also testified

4

regarding Brandon's sleeping difficulties. She stated that before Brandon's injury in 2008, he took Tylenol PM "off and on" to help him sleep.

The WCJ found that Brandon's death resulted from medications he was taking as a result of his industrial injury. Specifically, she found that amitriptyline and hydrocodone contributed to Brandon's death. In reaching this conclusion, the WCJ relied heavily on Dr. Bruff's testimony that amitriptyline was part of the causation "pie" and hydrocodone represented additional "crumbs" of that pie. The WCJ also noted that Brandon was having difficulty sleeping as a result of pain from his industrial injury and was prescribed Ambien and amitriptyline to help him sleep. She concluded that "[Brandon] took both the amitriptyline as well as the zolpidem (Ambien) as prescribed, in addition to the Xanax, Gabapentin and Vicodin. These drugs were all interactive and contributed to his death."

Petitioners sought reconsideration, contending that the WCJ's opinion was not supported by substantial evidence because Brandon's industrially prescribed medications did not materially contribute to his death. The WCJ issued a report and recommendation to the Board, explaining that the causal connection between employment and the injury is sufficient if the employment is a contributing cause of the injury; it need not be the sole cause. The WCJ confirmed her finding that Brandon's death was related to his industrial injury. The WCJ also stated that she recommended denying petitioners' request for reconsideration because they attempted to parse the evidence and only cited to evidence that was favorable to their position.

The Board adopted the WCJ's report and denied reconsideration.

5

DISCUSSION

*Legal Principles*

To be compensable under the workers' compensation system, a worker must show that his injury arose out of and in the course of employment and "[was] proximately caused by the employment . . . ." (Lab. Code, § 3600, subd. (a)(2) & (3), all undesignated statutory references are to this code.) "The tort concept of proximate causation requiring a sole cause is not followed in workers' compensation. [Citation.] Instead, the causal connection between employment and the injury is sufficient if the employment is a contributing cause of the injury." (*Guerra v. Workers' Comp. Appeals Bd.* (1985) 168 Cal.App.3d 195, 199 (*Guerra*).) In a death case, "[s]o long as the industrial injury and employment generally constituted material factors in contributing to the employee's death, the proximate cause test of . . . § 3600 is met." (1 St. Clair, Cal. Workers' Compensation Law and Practice (5th Ed. 1996) § 11.1.4, p. 755.)

Although workers' compensation law must be "liberally construed" in favor of the injured worker (§ 3202), an applicant has the burden of establishing a "reasonable probability of industrial causation" (*McAllister v. Workers' Comp. Appeals Bd.* (1968) 69 Cal.2d 408, 413 (*McAllister*)) by a preponderance of the evidence. (§ 3202.5.) "Whether an employee's injury is proximately caused by his employment is a question of fact. [Citation.] Judicial review of the Board's decision on factual matters is limited to determining whether the decision, based on the entire record, is supported by substantial evidence. [Citations.] This standard of review is not met by simply isolating evidence

6

which supports the Board and ignoring other relevant facts of record which rebut or explain that evidence. [Citation.]" (*Guerra*, *supra*, 168 Cal.App.3d at p. 199.)

"[I]n relying on the opinion of a particular physician in making its determination, the Board may not isolate a fragmentary portion of the physician's report or testimony and disregard other portions that contradict or nullify the portion relied on; the Board must give fair consideration to all of that physician's findings. [Citation.] . . . [I]n evaluating the evidentiary value of medical evidence, a physician's report and testimony must be considered as a whole rather than in segregated parts; and, when so considered, the entire report and testimony must demonstrate the physician's opinion is based upon reasonable medical probability. [Citations.] Hence, the Board may not blindly accept a medical opinion that lacks a solid underlying basis and must carefully judge its weight and credibility. [Citation.]" (*Bracken v. Workers' Comp. Appeals Bd.* (1989) 214 Cal.App.3d 246, 255 (*Bracken*).)

With these principles in mind, we examine the record to determine whether the Board correctly decided that Brandon's death resulted from medications he was taking as a result of an admitted industrial injury.

*Analysis*

Petitioners argue: (1) Brandon's wife and their minor children did not meet their burden to establish a causal connection between Brandon's death and the medication he was taking as a result of his industrial injury; and (2) the WCJ's decision was not supported by substantial evidence. We agree.

7

The WCJ's report, which was adopted by the Board, started with the premise that Dr. Bruff changed his opinion from the time of his report to the time of his deposition. This finding is not supported when viewed in light of the entire record. Dr. Bruff testified that "it's possible" that amitriptyline contributed to Brandon's death and it "could be an incremental contributor." Although Dr. Bruff went on to state that amitriptyline had a "small role" in Brandon's death, he confirmed that he stood by his initial report, which concluded that Brandon's death was the result of an additive drug interaction between zolpidem and alprazolam. This evidence does not establish a change of opinion.

However, even if Dr. Bruff's deposition testimony was a change of opinion, the new opinion was largely based on surmise, speculation, conjecture and guess. Dr. Bruff recognized the limitations of toxicology by noting that mixtures of drugs are difficult to quantify. After repeatedly being pushed to calculate the percentage of amitriptyline's contribution to Brandon's death, Dr. Bruff stressed that no medical person could offer a precise percentage because "it would be closing your eyes and throwing a dart at a dartboard." Although a precise percentage is not required, a workers' compensation applicant must show a "reasonable probability of industrial causation." (*McAllister*, *supra*, 69 Cal.2d at pp. 413, 417–418.) Thus, a physician's report and testimony must demonstrate his opinion is based on "reasonable medical probability." (*Bracken*, *supra*, 214 Cal.App.3d at p. 255.)

Here, Dr. Bruff admitted that it is difficult to make a "reasonable medical analysis" regarding amitriptyline's precise contribution to Brandon's death. He also stated that making that kind of determination "really gets to be speculative." Liberally construing Dr. Bruff's testimony and report in its totality, we conclude the evidence did not establish industrial causation. Rather, the evidence demonstrates that if amitriptyline played a role at all, it was not significant such that it constituted a material factor contributing to Brandon's death.

Lastly, we note that there is some dispute regarding whether Brandon was taking Ambien due to his industrial injury. Jovelyn testified that Brandon had trouble sleeping before his industrial injury and used Tylenol PM to help him sleep. However, the Tylenol PM was not working. In January 2009, Brandon's personal physician prescribed him Ambien for his sleeping difficulties. The physician noted that Brandon was not experiencing pain during the times he had trouble sleeping. Brandon's medical record indicates that around the same time, he used "*pain medication* mostly at night to help him get comfortable for sleep." Based on our review of the record, the evidence is insufficient to establish that Brandon used Ambien as a result of pain from his industrial injury.

DISPOSITION

The order denying reconsideration is annulled.  The matter is remanded to the

Board with directions to enter a new order denying the claim.


                                                 _____

                                                       McINTYRE, J.

WE CONCUR:


_____

                 HUFFMAN, J.


_____

            BENKE, Acting P. J.